**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

PRINCE PILGRIM,

                                        Plaintiff,

                - v -                                          Civ. No. 9:07-CV-1001
                                                                    (GLS/RFT)

DALE ARTUS, *Superintendent,*
*Clinton Correctional Facility,*

                                        Defendants.

**APPEARANCES:**                                **OF COUNSEL:**

PRINCE PILGRIM
Plaintiff, *Pro se*
92-A-8847
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ANDREW M. CUOMO                        AARON M. BALDWIN, ESQ.
Attorney General for the State of New York      Assistant Attorney General
Attorney for Defendant
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

<u>**REPORT-RECOMMENDATION and ORDER**</u>

         *Pro se* Plaintiff Prince Pilgrim has filed this civil rights action , pursuant to 42 U.S.C. § 1983

and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1

*et seq*., alleging that Defendant Dale Artus, Superintendent of Clinton Correctional Facility, violated

his constitutional and statutory rights to freely exercise his religious beliefs.  Dkt. No. 1, Compl.

The crux of Plaintiff's religious expression claim is that he was repeatedly punished for exercising

his sincerely held religious beliefs, which require him to wear dreadlocks, because he is a member

of the Nation of Islam ("NOI") and Department of Correctional Services' ("DOCS") policy allows only those of the Rastafarian faith to wear dreadlocks. *See generally id.*

In addition, Plaintiff alleges that Artus failed to protect him from unconstitutional retaliation, his due process rights were violated during the course of several disciplinary hearings, and the penalties imposed as a result of his disciplinary convictions constituted "cruel and unusual punishment" in violation of the Eighth Amendment. *Id.*

Presently before the Court for a Report-Recommendation is Defendant's Motion for Summary Judgment. Dkt. No. 36. Since the filing of Defendant's Motion, the Court has granted Plaintiff four separate extensions of time to file a response in opposition to the Motion. *See* Dkt. No. 46, Order, dated Aug. 20, 2009, at p. 1 (cataloguing prior extensions). The final extension granted Plaintiff until September 4, 2009, to file a response, and warned Plaintiff that "**failure to oppose Defendant's Motion will result in this Court accepting the facts set forth by Defendant as true**." *Id.* at p. 3 (emphasis in original) (citing N.D.N.Y.L.R. 7.1(a)(3)). Despite this Court's leniency and warnings, Plaintiff's Response[1] was not received until September 10, 2009, six days after the deadline passed. Dkt. No. 47, Pl.'s Resp. in Opp'n to Def.'s Mot. Notwithstanding Plaintiff's failure to meet the extended deadline, because he is proceeding *pro se*, we will nonetheless consider his Response and the Exhibits attached thereto in issuing a recommendation on Defendant's Motion.

For the reasons that follow, we recommend that Defendant's Motion be **granted** in part and **denied** in part.

---

[1] Plaintiff's Response consists of (1) an Affidavit, dated August 31, 2009, which is in sum and substance a concise memorandum of law, and (2) a Declaration, dated August 31, 2009, which is in sum and substance a statement of material facts, with attached Exhibits. *See* Dkt. No. 47.

## I.  FACTS NOT IN DISPUTE

The following facts were derived mainly from the Defendant's Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff.  *See* N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." (emphasis in original)).  In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional and statutory violations.

Plaintiff was received into DOCS' custody on or about November 4, 1992.  Dkt. No. 36-2, Def.'s 7.1 Statement, at ¶ 1.  At all times relevant to the Complaint, and continuing until the present, Defendant Dale Artus has been the Superintendent of Clinton Correctional Facility ("Clinton"), where Plaintiff was confined from April 1, 2005 through February 5, 2009.  *Id.* at ¶ 2.  Plaintiff is currently incarcerated at Attica Correctional Facility.  *Id.*

On November 18, 2006, Plaintiff was given a direct order by Corrections Officer ("C.O.") A. Appleby to remove his dreadlocks as per DOCS' policy, which allows only inmates of the Rastafarian faith to wear dreadlocks.  *Id.* at ¶ 18; Dkt. No. 47-1, Prince Pilgrim Decl., dated Aug. 31, 2009 (hereinafter "Pl.'s Decl."), at ¶ 14.  DOCS' hair policy is based on DOCS Directive #4914, entitled "Inmate Grooming Standards," and relevant decisions from the Central Office Review Committee ("CORC"), which is the final appellate body for inmate grievances and whose decisions have the same effect as directives.  Dkt. No. 36-6, Mark Leonard Decl., dated Apr. 30, 2009, at ¶ 59.  DOCS Directive #4914 allows inmates to wear long hair[2] provided they tie it back in a ponytail at all times, but does not specifically permit nor disallow dreadlocks.  *Id.*, Ex. B, DOCS Directive

---

[2] DOCS Directive #4914 defines "long" as "below shoulder length."  Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(b).

#4914(III)(B)(2)(a)-(d).  However, relevant CORC decisions have made clear that "[o]nly inmates of the Rastafarian faith may have dreadlocks." *Id.*, Ex. C, CORC Decision, dated May 8, 2003.

On December 19, 2006, C.O. C. Strong observed Plaintiff, who was on his way to an NOI meeting, with his hair in dreadlocks that extended down to the middle of his back.  *Id.* at ¶ 17; Pilgrim Decl. at ¶¶ 17-18.  C.O. Strong issued Plaintiff a Misbehavior Report (hereinafter "First MR"), charging him with Refusal to Obey a Direct Order (Rule 106.10).  Def.'s 7.1 Statement at ¶ 19.  At a Tier II Hearing that concluded on December 27, 2006, Lieutenant ("Lt.") Boyle found Plaintiff guilty of the charge and assessed him a penalty of thirty (30) days keeplock,[3] with loss of commissary, package and phone privileges.  *Id.* at ¶ 20.  During that hearing, Boyle refused Plaintiff's request to call Defendant Superintendent Artus as a witness, reasoning that because Artus was not present nor otherwise involved in the incident, his testimony would not be germane to the charge at issue.  *Id.* at ¶¶ 40-41.  However, Plaintiff was allowed to call other witnesses including two C.O.'s and another inmate.  *Id.* at ¶ 42.  Plaintiff's appeal, dated December 27, 2006, was delegated by Defendant Artus to Captain J. Bell, who affirmed Boyle's decision.  *Id.* at ¶ 21.

On February 20, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Second MR") by C.O. Appleby for again failing to cut his dreadlocks and thereby refusing to comply with both a direct order and a prior hearing disposition.  *Id.* at ¶¶ 22-23; Pl.'s Decl. at ¶ 21.  A Tier II Hearing was conducted by Lt. Lucia, who found Plaintiff guilty of Refusal to Obey a Direct Order (Rule 106.10) and Noncompliance with a Hearing Disposition (Rule 181.10), and assessed Plaintiff thirty (30) days keeplock, with corresponding loss of recreation, commissary, package and phone

---

[3] Generally speaking, inmates placed on keeplock are restricted to their cells for twenty-three (23) hours a day, given one hour for exercise, and are denied participation in normal prison activities that occur outside of their cells. *Parker v. Peek-Co*, 2009 WL 211371, at *4 n.6 (N.D.N.Y. Jan. 27, 2009) (citing cases).

privileges, and an additional fifteen (15) days keeplock and loss of privileges invoked from a previous disciplinary hearing determination. Def.'s 7.1 Statement at ¶¶ 23-24; Pl.'s Decl. at ¶ 25. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision on March 5, 2007. Def.'s 7.1 Statement at ¶ 25; Pl.'s Decl. at ¶ 26. By letters dated March 14, 2007, and March 21, 2007, Plaintiff requested a discretionary review of the March 1, 2007 Tier II Hearing disposition, raising issues as to whether or not he should have been credited for time spent in pre-hearing confinement. Def.'s 7.1 Statement at ¶ 26. Artus delegated that petition to G. Haponik, First Deputy Superintendent, who denied the requested relief. *Id.* at ¶ 27.

Also on February 20, 2007, Plaintiff filed a grievance with the Inmate Grievance Program ("IGP") at Clinton, alleging harassment and unlawful discrimination on the part of C.O. Appleby, and taking issue with DOCS' policy regarding dreadlocks. *Id.* at ¶¶ 43-44; Pl.'s Decl. at ¶ 22. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance on the grounds that there was a pending misbehavior report against Plaintiff, making the issue non-grievable. Def.'s 7.1 Statement at ¶ 45. Plaintiff's appeal to the Superintendent was referred to the IGP Supervisor, who agreed with the IGRC's determination and issued a memorandum to Plaintiff denying his appeal. *Id.* at ¶¶ 46-47.

On August 1, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Third MR") by C.O. J. Way for failure to comply with a prior direct order to cut his hair. *Id.* at ¶ 28. Along with Refusal to Obey a Direct Order (Rule 106.10), Plaintiff was charged with Harassment (Rule 107.11) for using obscene language during his confrontation with C.O. Way, and Inmate Grooming (Rule 110.33) for failure to tie back his long hair. *Id.* at ¶ 31. Lt. Miller conducted a Tier

II Hearing on August 1, 2007, at which time Plaintiff was found guilty of refusing a direct order and having unfastened long hair, but not guilty of harassment. *Id.* at ¶ 32. Plaintiff was penalized with thirty (30) days keeplock and loss of commissary, package, and phone privileges for the same amount of time. *Id.* at ¶ 33. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision. *Id.* at ¶ 34.

On September 12, 2007, C.O. Edwards issued Plaintiff a fourth Misbehavior Report (hereinafter "Fourth MR") concerning his dreadlocks. *Id.* at ¶¶ 35-36. The Fourth MR charged Plaintiff with Refusal to Obey a Direct Order (Rule 106.10) and making a False Statement (Rule 107.20), the latter charge owing to Plaintiff's alleged statement that he was a Rastafarian when, in fact, he was registered as an NOI member. *Id.* at ¶¶ 36-37; Pl.'s Decl. at ¶ 34. A Tier II Hearing was held on September 17, 2007, before Lt. Miller, who found Plaintiff guilty on both charges and sentenced him to thirty (30) days keeplock with concurrent loss of commissary, package, and phone privileges. Def.'s 7.1 Statement at ¶ 38.

On or about November 26, 2007, Plaintiff filed another grievance with the IGP, dated November 17, 2007, complaining that DOCS' policy regarding dreadlocks did not comply with DOCS Directive # 4914 and violated his First Amendment rights. *Id.* at ¶ 48. That grievance was consolidated with similar grievances filed by other inmates at Clinton who were given similar orders and/or warnings regarding their hair. *Id.* at ¶ 49; Pl.'s Decl. at ¶ 36. After conducting an investigation, First Deputy Superintendent W.F. Hulihan issued a determination, dated December 19, 2007, stating that "DOCS policy is that registered Rastafarian religion inmates are the only inmates allowed to have dreadlock hairstyles . . . . This issue has been addressed in numerous CORC decisions . . . . Based on DOCS established policy and CORC decisions, no compelling evidence has

been submitted to support a change in policy." Def.'s 7.1 Statement at ¶ 52.  Plaintiff and the other grievants appealed Hulihan's determination to CORC, which upheld the decision.  *Id.* at ¶ 53.

Plaintiff wrote Defendant Artus many times during his incarceration at Clinton, the issue of his sanctions for wearing dreadlocks being the predominant topic of such correspondences.  *Id.* at ¶ 54; Compl. at ¶ 4.  On each occasion that he received a letter of complaint, request for an investigation, appeal, etc., from Plaintiff, Artus referred the matter to a deputy superintendent or other staff member for review, response, or other necessary action.  Def.'s 7.1 Statement at ¶ 56.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "'pleadings, depositions, answers to interrogatories, and admissions on file, together with [] affidavits, if any,'" that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is ]a genuine issue for trial," and cannot rest "merely on allegations or denials"

of the facts submitted by the movant.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . .  interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995).  Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## B.  Personal Involvement

-8-

1. *Due Process, Retaliation, and Cruel and Unusual Punishment*

Plaintiff alleges that Defendant Artus violated his First, Eighth, and Fourteenth Amendment rights by failing to overturn disciplinary sanctions, thereby subjecting him to punishments that were cruel and unusual, and by allowing others to retaliate against him.  Defendant asserts he was not personally involved in any of those alleged constitutional violations.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted).  Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted).  Thus,  "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, __U.S.__, 129 S. Ct. 1937, 1948 (2009).

Nonetheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff does not allege that Defendant Artus directly participated in any of the alleged harassment, retaliation, due process violations, nor disciplinary actions that were taken

against him.  Rather, Plaintiff hangs his hat on the second of the five aforementioned ways in which supervisory liability may attach: "failure to remedy a wrong after being informed through a report or appeal."  *Id.* at 145.  Plaintiff asserts that he sent several grievances, complaint letters, and appeals of his disciplinary convictions to Artus, who was thereby made aware of the allegedly unconstitutional policy regarding dreadlocks and the harassments and  retaliatory misbehavior reports that were being filed against Plaintiff, but that Artus nonetheless failed to intervene on Plaintiff's behalf.  The record establishes that Plaintiff appealed to Artus at least three of the four Tier II Hearing dispositions that are relevant to this lawsuit, and that he filed several grievances and complaint letters with Artus.[4]  *See* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Exs. A-U, Docs. related to Pl.'s Misbehavior Reps. & Grievances.

However, while personal involvement may be found where a supervisory official personally reviews and denies a grievance, the mere referral of an inmate's complaint by a supervisory official to the appropriate staff for investigation is not sufficient to establish personal involvement.  *See Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009) (quoting *Harnett v. Barr*, 538 F. Supp. 2d 511, 524-25 (N.D.N.Y. 2008)); *cf. Charles v. New York State Dep't of Corr. Servs.*, 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) (noting that "courts in this circuit have held that when a supervisory official ***receives and acts on*** a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated" (emphasis

---

[4] Defendant contends that Plaintiff did not appeal the disposition rendered at the fourth Disciplinary Hearing held on September 17, 2007.  As opposed to his appeals on the first three Tier II Disciplinary Hearing dispositions, there is no record evidence of any appeal taken as to the fourth.  *See generally*, Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Ex. E, Fourth MR Docs.  Plaintiff has not presented any evidence in opposition to Defendant's claim that he did not exhaust the administrative remedies available to him with respect to the fourth hearing.  *See also* Compl. at ¶ 1 (stating that Plaintiff filed "*three* appeals to Tier II Disciplinary Hearings to Superintendent Dale Artus" (emphasis added)).

*-10-*

in original) (citation omitted)).   Moreover, "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (internal quotation marks and citation omitted). Even "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Flemming v. Wurzberger*, 2006 WL 1285627, at *2 (W.D.N.Y. May 10, 2006) (internal quotation marks and citations omitted).

In this case, Artus asserts that he referred each and every one of Plaintiff's appeals and grievances to subordinate staff members for review, investigation, and appropriate action.   Artus Decl. at ¶ 13.  The documentary record confirms that contention.  Artus referred Plaintiff's appeals of his convictions on the First, Second, and Third MRs to Captain Bell, who reviewed and affirmed the dispositions rendered at the corresponding Tier II Hearings.  *Id.*, Exs. B-D, Interdep't Comm'ns, dated Jan. 3, 2006, Mar. 5, 2007, & Aug. 16, 2007.  In addition, all of the grievances, complaints, and appeals of grievances mentioned in Plaintiff's Response to Defendant's Motion were forwarded by Artus to staff members in order to investigate, render a decision, and take appropriate actions. Artus Decl. at ¶ 13; Dkt. No. 47, Prince Pilgrim Aff., dated Aug. 31, 2009 (hereinafter "Pl.'s Aff.") at p. 5.  Namely, Plaintiff's grievances dated November 9, 2006, November 21, 2006, November 28, 2006, February 20, 2007, July 1, 2007, August 1, 2007, and October 5, 2007,[5] were all responded to by Artus's subordinate staff members.  Pl.'s Aff., Ex. F, Interdep't Mem., dated Nov. 13, 2006;

---

[5] Plaintiff also mentions complaints/grievances filed on October 22, 2006, and August 30, 2007.  Pl.'s Aff. at p. 5.  The only correspondences on the record with those corresponding dates are a letter Plaintiff wrote to Assistant Deputy Superintendent S. Garman on October 22, 2006, regarding his self-nomination for Inmate Liaison Committee Representative, and a letter to IGP Supervisor T. Brousseau dated August 30, 2007, in which Plaintiff enclosed two previously filed grievances that allegedly had not been acknowledged at that point.  Pl.'s Decl., Ex. E & H, Lts. dated Oct. 22, 2006, & Aug. 30, 2007.  Neither of these letters was sent to Artus, nor did they implicate Plaintiff's issues regarding his dreadlocks.

Ex. H, Interdep't Mem., dated Nov. 13, 2006 (referring 11/9/06 grievance to Deputy Sup't for Sec.

J. Tedford); Ex. I, Interdep't Mem., dated Nov. 29, 2006 (referring 11/21/06 grievance to Deputy

Sup't of Programs L. Turner); Ex. J, Interdep't Mem., dated Nov. 29, 2006 (referring 11/28/06

grievance to Tedford); Ex. N, Interdep't Comm'n, dated Feb. 23, 2007 (forwarding 2/20/07

grievance to Deputy Sup't of Security Servs. S. Racette); Exs. Q-S, Interdep't Comm'ns, dated July

5, Aug. 7 & Oct. 10, 2007 (referring grievances dated 7/1/07, 8/1/07, and 10/5/07 to IGP Supervisor

T. Brousseau).

Because Plaintiff has failed to rebut Defendant's documentary case that his involvement was

limited to forwarding Plaintiff's disciplinary appeals, complaints, grievances, and appeals of

grievances to other staff members, we recommend that all of Plaintiff's claims, with the exception

of his RLUIPA and First Amendment religious expression claims,[6] be **dismissed** for lack of personal

involvement.  *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that the referral of

appeals down the chain of command does not create personal involvement on the part of the referee);

*see also Brown v. Goord*, 2007 WL 607396, at *10 (N.D.N.Y. Feb. 20, 2007) (citing cases for the

proposition that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read

and respond to. . .complaints by prisoners" without becoming personally involved); *Cruz v.*

*Edwards*, 1985 WL 467, at *4 (S.D.N.Y. Mar. 25, 1985) (finding defendant superintendent was not

personally involved when he referred the appeal to the deputy superintendent).

Moreover, even if we were to look past Plaintiff's failure to demonstrate Artus's personal

involvement, we would still find all of his constitutional claims (again with the notable exception

of his First Amendment religious expression claim) to be without merit.

---

[6] We discuss the personal involvement issues related to Plaintiff's RLUIPA and First Amendment religious expression claims below in Part II.C.2.

*-12-*

a. Due Process

In his Complaint, Plaintiff appears to make a due process claim based on "prejudicial" hearings and other unspecified procedural violations that occurred during those Hearings. Compl. at ¶ 10; Pl.'s Aff. at ¶ 15; *see also* Pl.'s Decl. at ¶ 24 (stating that the proceedings were "hollow"). This claim is wholly conclusory. Plaintiff does not identify which of the four Tier II Disciplinary Hearings was conducted in a prejudicial manner, nor does he describe any of the alleged procedural violations that occurred. *See Bell. Atl. Corp. v. Twombly*, 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In short, Plaintiff has not stated a plausible due process claim.

Even if we were to look past the conclusory nature of Plaintiff's due process claim, we would still recommend dismissal of such claim. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Here, Plaintiff alleges that he was sentenced to and served three separate thirty (30) day and one forty-five (45) day period of keeplock with reduced privileges, but alleges no additional aggravating circumstances present during that confinement. Courts in this Circuit have held that such periods of keeplock, absent additional egregious circumstances, are not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process

Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully*, 893 F. Supp. 259, 263 (S.D.N.Y. 1995) (45 days of keeplock is not atypical and significant), *Rivera v. Coughlin*, 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest).  Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU").  *See Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone*, 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair*, 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest).  Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed.**

### b.  Retaliation

Plaintiff claims that the disciplinary actions taken against him by DOCS staff members constituted retribution for grievances he filed and that Artus failed to protect him from such reprisals.  Compl. at ¶¶ 4 & 8; Pl.'s Aff. at ¶¶ 11 & 19.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) & *Franco v. Kelly*, 854

*-14-*

F.2d 584, 590 (2d Cir. 1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord*, 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia*, the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky*, 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively*, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that

*-15-*

burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut*, 193 F.3d 144, 148-49 (2d Cir. 1999); *see Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998); *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994).

In this case, Plaintiff alleges that the disciplinary actions taken against him were done in retaliation for grievances he filed. Pl.'s Aff. at ¶ 19. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access . . . to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.'" *Franco v. Kelly*, 854 F.2d at 589 (quoting *Haymes v. Montanye*, 547 F.2d 188, 191 (2d Cir. 1976)) (emphasis and alterations in original). Thus, Plaintiff has met his burden of showing he was engaged in constitutionally protected conduct.

However, the record is clear that all of the disciplinary actions taken against Plaintiff were due to his failure to abide by orders directing his compliance with DOCS' hair policy. *See* Artus Decl., Exs. B-E, Disciplinary Packets for MR's 1-4. Therefore, even assuming Plaintiff could show that such disciplinary actions were motivated by retaliatory animus (an assumption that finds no basis in the record), Plaintiff's retaliation claims would fail because it is undisputed that his dreadlocks violated DOCS' policy, and thus, the DOCS employees who disciplined Plaintiff can easily show that they would have taken the same disciplinary actions even in the absence of his

protected conduct. *See Davidson v. Chestnut*, 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). Although Plaintiff has challenged DOCS' hair policy in this lawsuit, there is no suggestion that at the time he was disciplined, that policy was not valid. Thus, because there is unrefuted evidence that Plaintiff was disciplined pursuant to a valid DOCS' policy, his retaliation claims must fail.

### c. Cruel and Unusual Punishment

Although unclear, it appears that Plaintiff asserts an Eighth Amendment claim based on the conditions of his confinement while he served his disciplinary sanctions, which included serving three thirty (30) day and one forty-five (45) day periods in keeplock, loss of phone and commissary privileges, no regular visits, twenty-three (23) hour confinement, and only three showers a week. Compl. at ¶ 6.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996)). Here, Plaintiff does not allege that he was denied the "minimal civilized measure of life's necessities," rather, he states that he was placed on keeplock and denied various privileges for three thirty (30) day and one forty-five (45) day periods.[7] These conditions are not so severe as to violate the Eighth Amendment's ban on cruel and unusual

---

[7] Plaintiff also alleges, in conclusory fashion, that he was denied access to the law library during his periods in keeplock confinement. Compl. at ¶ 6. To the extent Plaintiff attempts to raise an access to the courts claim under the First Amendment, any such claim would fail for want of personal involvement and because Plaintiff has not alleged any injury resulting from his alleged denial of access to the law library. *See Lewis v. Casey*, 518 U.S. 343, 353 (1996).

punishment.  *See Parker v. Peek-Co*, 2009 WL 211371, at *4 (N.D.N.Y. Jan. 27, 2009) ("It is well

established . . . that placement in keeplock confinement under the conditions normally associated

with that status does not violate an inmate's Eighth Amendment rights.") (citation omitted); *see also*

*Jackson v. Johnson*, 15 F. Supp. 2d 341, 363 (S.D.N.Y. 1998) ("The mere placement in keeplock

for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth

Amendment") (citing cases).  Therefore, it is recommended that this claim be **dismissed** as a matter

of law.

### C.  RLUIPA and First Amendment Claims

#### 1.  *Merits of Plaintiff's Claims*

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious

needs and are therefore dependent on the government's permission and accommodation of exercise

of their religion."[8] *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005).  RLUIPA  provides that

> No government shall impose a substantial burden on the religious exercise of a
> person residing in or confined to an institution . . . even if the burden results from a
> rule of general applicability, unless the government demonstrates that imposition of
> the burden on that person –
>
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the prison regulations constitute

a "substantial burden" on his religious exercise without promoting a *compelling* governmental

---

[8] RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores*, 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under Section 5 of the Fourteenth Amendment.  "RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison."  *Fluellen v. Goord*, 2007 WL 4560597, at *5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

interest that is advanced through *the least restrictive means*.  As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests.  482 U.S. 78, 89 (1987).

The first issue is whether Plaintiff's freedom of religious expression has been substantially burdened.  Plaintiff is a registered NOI member.  The NOI does not require him to wear dreadlocks, however, Plaintiff asserts that he wears dreadlocks pursuant to his own personal faith and interpretations of the Qu'ran and Bible.  Pl.'s Decl. at ¶ 43.  As Plaintiff explains, his

> refusal to cut his hair is rooted in the spiritual understanding that he is "<u>one</u>" with the Original Man, Blackman, who is Allah, as Plaintiff is a Blackman thus claiming the Holy Qu'ran and Bible as his blueprint of his lifestyle and hair:
>
>> A.  Holy Qu'ran provision, surah (Chapter) 2, verse 196: "And accomplish the pilgrimage and the visit for ALLAH.  But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches its destination."
>>
>> B.  Holy Bible, Numbers, Chapter 6, verse 5, commonly referred to as the Nazarite Vow 8[:] "All the days of the vow of his Naziriteship no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow."

*Id*. at ¶ 43 (emphasis in original).

Defendant contends that because Plaintiff's desire to wear dreadlocks is "merely a personal choice and is not based upon NOI tenant or dogma," DOCS' policy does not substantially burden his sincerely held religious beliefs.  Dkt. No. 36, Def.'s Mem. of Law at p. 31; *see also* Leonard Decl. at ¶ 65.  RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  Thus, the question of

-19-

whether Plaintiff's personal religious beliefs are founded in any particular established religion is inapposite.   However, RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson*, 544 U.S. at 725 n.13.   On that subject, the record shows that Plaintiff has been growing dreadlocks for religious reasons since approximately 1993.   Dkt. No. 36-3, Pl.'s Dep. at p. 12.   In addition, Plaintiff's continued refusal to cut his hair despite the successive punishments he received arguably supports his professed sincerity.   Simply put, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs.

RLUIPA does not define "substantial burden," however, the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence . . . Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citations omitted).   The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717-718 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck*).   In this case, there can be little doubt that the DOCS' policy in question substantially burdens Plaintiff's religious exercise by forcing him to choose between cutting his hair and being subjected to disciplinary punishment.   In *Amaker v. Goord*, 2007 WL 4560596 (W.D.N.Y. Mar. 9, 2007), the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, addressed a motion for a preliminary injunction on facts nearly identical to those established here, and concluded that "forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliations with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's

religious practice." 2007 WL 4560596, at *6;[9] *see also Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007) (noting that "demonstrating a substantial burden is not an onerous task for the plaintiff").

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc-2(b). On the first point, Defendant has asserted an interest in maintaining prison security, which he alleges could be undermined if more prisoners are allowed to wear dreadlocks, which can be used to conceal weapons. Def.'s Mem. of Law at pp. 32-33; Dkt. No. 36-8, Lucien J. LeClaire, Jr., Decl., dated Apr. 30, 2009, at ¶¶ 7-21; Leonard Decl. at ¶¶ 48-57 & 68. Without question, DOCS' interest in safety and security is a compelling governmental interest. *See Cutter v. Wilkinson*, 544 U.S. at 725 n.13.

But, in order to defeat Plaintiff's RLUIPA claim, Defendant must also show that DOCS' policy is the least restrictive means of furthering its compelling interest in security. We believe there are questions of material fact on that issue. Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Leonard Decl. at ¶ 63. Also, Directive #4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a "Afro-natural" style. Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(a),(d). Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-

---

[9] The district court adopted Judge Schroeder's recommendation that the preliminary injunction be granted because the prisoners had shown a likelihood of success on the merits of their claim that DOCS' policy precluding NOI members from wearing dreadlocks violated RLUIPA. *Amaker v. Goord et al.*, 2007 WL 4560595 (W.D.N.Y. Dec. 18, 2007).

Rastafarian prisoners.  Plaintiff asserts that the least restrictive means of ensuring security is already

provided in DOCS Directive #4914(III)(B)(2)(e), which states that

> [a]n inmate may be subjected to a hair search when there is reason to believe that
> contraband may be discovered by such a search.  An inmate may be subjected to
> such search at any time that a pat frisk, strip search, or strip frisk is being conducted.
> Consistent with Directive #4910, during a pat frisk, an inmate will be required to run
> fingers through [his] hair.  During a strip search, an inmate may be subjected to an
> inspection of his or her hair.  During a strip frisk, an inmate will run his or her hands
> through the hair.

*Id.*

DOCS Deputy Commissioner for Correctional Facility Security Lucien J. LeClaire, Jr., responds to

that argument in his Declaration, asserting that "[l]arge, long dreads and the matted hair close to the

scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for

inmates to run their fingers through to allow staff to insure that no contraband is contained therein."

LeClaire Decl. at ¶ 18.  LeClaire  further argues that if an inmate need only declare a personally held

religious belief in growing dreadlocks in order to be given permission to do so, DOCS will have no

ability to restrict the number of inmates wearing dreadlocks.  *Id.* at ¶ 19.  The Court does not

overlook the weight of these arguments nor the deference courts must accord prison officials when

analyzing their policies.  However, we question the assumption that permitting dreadlocks to be

worn by inmates whose sincerely held religious beliefs require them would open the proverbial

floodgates.  Under DOCS' current policy, any nefariously motivated inmate need only register

himself as a Rastafarian in order to be given permission to wear dreadlocks, and there is no evidence

presented to the Court that such policy has resulted in a substantial increase in the

Rastafarian/dreadlock-wearing inmate population.  Leonard Decl. at ¶ 63; *see also* Artus Decl., Ex.

D, Misbehavior Rep., dated Aug. 1, 2007 (stating "[i]nmate Pilgrim was given a direct order on July

1st 2007 to cut his dreadlocks or become a registered Rastafarian") & Leonard Decl., Ex. C, CORC

Decision, dated Feb. 9, 2005 (ruling that "staff have correctly directed the grievant to remove his dreadlocks, or change his religious designation"). Moreover, because DOCS has deemed its current policy adequate to protect its safety interests with respect to all of the other permitted hairstyles as well as for Rastafarian inmates with dreadlocks, a material question of fact exists as to why that policy would not also suffice for inmates in Plaintiff's position. *See Amaker v. Goord et al.*, 2007 WL 4560595.

Even under a First Amendment analysis, questions of fact remain. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted).

The first two prongs have been met in this case. As discussed above, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs, nor any suggestion that Plaintiff is personally motivated by fraud or is otherwise attempting to deceive DOCS officials. And, on the second prong, Plaintiff has shown that DOCS' policy substantially burdens his religious beliefs. *See Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006).[10] As to the third prong, the Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*,

---

[10] In *Salahuddin*, the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been "substantially burdened." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 n.5 (2d Cir. 2006). *See also Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008) (noting that the Second Circuit has twice declined to answer the question). To the extent that heightened standard applies to all free exercise claims, Plaintiff has met it by showing that DOCS' policy substantially burdens his religious beliefs.

482 U.S. at 89.  Courts look to the following four factors in determining the reasonableness of a prison regulation: 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.  *Id.* at 89-91 (citations omitted).

DOCS has a compelling and legitimate penological interest in maintaining prison security.  The policy in question, which seeks to limit the number of prisoners who are allowed to wear dreadlocks, which can be used to hide small weapons, is rationally related to that interest.  The other remaining three factors, however, weigh against Defendant.  On the second *Turner* factor, the Court is not aware of any other means of exercising this particular religious belief other than physically growing dreadlocks.  As to the third factor, as previously discussed, questions of fact exist as to what effect the accommodation of Plaintiff's beliefs would have on the entire prison system, especially considering the fact that DOCS' current policy allows any inmate who self-identifies as Rastafarian to wear dreadlocks.  For the same reasons, we believe a question of fact exists as to whether there are ready alternatives to DOCS' current policy, including the procedures already applied to those whom DOCS currently allows to wear dreadlocks and other long hair styles.  Overall, there are material questions of fact as to the reasonableness of DOCS' policy Plaintiff has challenged.  *See Benjamin v. Coughlin*, 905 F.2d 571, 576-77 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990) (affirming district court's finding that DOCS' policy requiring Rastafarian inmates to cut their dreadlocks upon arrival into DOCS' custody was not reasonably related to the asserted penological interests when defendants did not demonstrate that the religious accommodation sought by prisoners would have

"more than a de minimis effect on valid penological interests"); *see also Francis v. Keane*, 888 F. Supp. 568, 577 (S.D.N.Y. 1995) (denying summary judgment where two Rastafarian C.O.'s challenged DOCS' grooming regulation prohibiting dreadlocks for officers); *Amaker v. Goord*, 2007 WL 4560595.

## 2. *Personal Involvement*

Although neither party addresses the issue in their respective submissions to the Court, there is a question as to whether Plaintiff has sufficiently alleged personal involvement with respect to his RLUIPA claim. Neither the Supreme Court nor the Second Circuit have directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims.[11]  *See Joseph v. Fischer*, 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith*, 2009 WL 3199520, at *9 (N.D.N.Y. Sept. 30, 2009) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at *2 (S.D. Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill*, 2009 WL 890521, at *3 (S.D. Ohio Mar. 31, 2009); *Alderson v. Burnett*, 2008 WL 4185945, at *3 (W.D. Mich. Sept. 8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc-1(a), and defines "government" as "(i) a State, county,

---

[11] The Court's research uncovered no ruling that a plaintiff need *not* show personal involvement in order to bring a valid RLUIPA claim.

municipality, or other governmental entity created under the authority of the State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law," 42 U.S.C. § 2000cc-5(4)(A).  Thus, RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.

In this case, the uncontroverted record shows that Artus took no actions relevant to Plaintiff's claims beyond referring Plaintiff's complaints, grievances, and appeals to his subordinates.  Artus Decl. at ¶ 13.  Moreover, the record does not show, and it is not alleged, that Artus was the creator of the DOCS' policy Plaintiff is challenging.  *Id.* at ¶ 8 (noting that the policy is based on DOCS Directive #4914 and relevant CORC determinations, which have the effect of Directives).  Plaintiff has not sued DOCS, nor any DOCS employee responsible for creating and/or enforcing the challenged policy.

However, considering Plaintiff's *pro se* status, the lack of finality in this Circuit on the issue of personal involvement in RLUIPA claims, and judicial economy, the Court recommends that DOCS and DOCS Commissioner Brian Fischer be substituted as proper Defendants to this action solely as to Plaintiff's RLUIPA and First Amendment free exercise claims.[12]  *See Zuk v. Gonzalez*, 2007 WL 2163186, at *2 (N.D.N.Y. July 26, 2007) (adding a proper defendant, *sua sponte*, in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* FED. R. CIV. P. 21

---

[12] Defendant asserts that Plaintiff's claims are moot because he has been transferred from Clinton Correctional Facility, where Artus is the Superintendent, to Southport Correctional Facility.  Def.'s Mem. of Law at p. 38 (quoting *Salahuddin v. Goord* for the proposition that "an inmate's transfer from a prison facility generally renders moot any claims for declaratory judgment and injunctive relief against the officials of that facility.").  However, because we recommend that DOCS and Commissioner Fischer be added to the case as Defendants, this mootness argument is without merit.

("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker*, 2006 WL 5893295, at *7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a defendant in a FTCA claim brought by a *pro se* plaintiff); *Ciancio v. Gorski*, 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999) (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").

### 3. *Monetary Damages under RLUIPA*

Defendant argues that Plaintiff is barred from seeking monetary damages for the alleged RLUIPA violation.  Def.'s Mem. of Law at p. 29.  RLUIPA allows for "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), but does not specify what types of relief it makes available. The Second Circuit has not yet ruled on the issue, and there appears to be a divide amongst the other circuit courts that have addressed it.  *See Bock v. Gold*, 2008 WL 345890, at *5-7 (D.Vt. Feb. 7, 2008) & *Pugh v. Goord*, 571 F. Supp. 2d 477, 506-08 (S.D.N.Y. 2008) (both noting the split among circuit and district courts).

However, the district courts in this Circuit have held that monetary damages are not available under RLUIPA against state defendants in either their official or individual capacities.[13]  Looking to the Eleventh Amendment's protection of the states' sovereign immunity, courts have held that because RLUIPA does not make an unequivocal waiver of sovereign immunity with respect to monetary damages against state defendants in their official capacities, such relief is not available. *See Pugh v. Goord*, 571 F. Supp. 2d at 509 ("'To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such

---

[13] Research has not revealed any district court in this Circuit that has concluded otherwise.

monetary claims.'"(quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)); *see also Bock v. Gold*, 2008 WL 345890, at *6; *El Badrawi v. Dept. of Homeland Sec.*, 579 F. Supp. 2d 249, 258-63 (D. Conn. 2008). In addition, courts in this Circuit have held that to allow claims against defendants in their individual capacities would raise serious constitutional questions about whether RLUIPA exceeds Congress's powers under the Spending Clause (Article 1, Section 9, Clause 1) of the Constitution.[14] *See Pugh v. Goord*, 571 F. Supp. 2d at 506-07; *Vega v. Lantz*, 2009 WL 3157586, at *4 (D. Conn. Sept. 25, 2009) (holding that RLUIPA does not allow damages against defendants in their individual capacities and citing cases). Essentially, courts have found that because Congress enacted RLUIPA pursuant to the Spending Clause, not its power to enforce the provisions of the Fourteenth Amendment under Section 5 of the same, there is no constitutional basis for Congress to enforce RLUIPA as to individual defendants, who are not parties to the "contract" between the federal government and the states pursuant to which, as a normal practice, the former provides funding to the latter in exchange for compliance with certain conditions. *See Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 328 (5th Cir. 2009) (holding that "individual RLUIPA defendants are not parties to the contract in their individual capacities") (cited in *Vega v. Lantz*, 2009 WL 3157586, at *4); *see also Pugh v. Goord,* 571 F. Supp. 2d at 506-07 (citing *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007) for the same proposition). Because interpreting RLUIPA to allow suits against individuals would call into question the constitutionality of the statute itself, courts have applied the

---

[14] Both the Eleventh and the Fifth Circuits have explicitly held that Congress enacted RLUIPA pursuant to its power under the Spending Clause, not the Commerce Clause. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 329 n.34 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1274 n.9 (11th Cir. 2007). We agree with those courts that because "there is no evidence concerning the effect of the substantial burden" on interstate commerce, RLUIPA must necessarily be Spending Clause legislation. *See Sossamon v. Lone Star State of Texas*, 560 F.3d at 329 n.34.

canon of constitutional avoidance[15] in concluding that RLUIPA does not permit such causes of action.  *See Bock v. Gold*, 2008 WL 345890, at *6.

Based on the above reasoning, we agree with the other district courts in this Circuit that RLUIPA does not allow monetary damages against individual defendants in their individual or official capacities.  *See Pugh v. Goord*, 571 F. Supp. 2d at 507 (citing cases); *see also Sweeper v. Taylor*, 2009 WL 815911, at *9 (N.D.N.Y. Mar. 27, 2009) (holding that no monetary damages are available under RLUIPA).  Therefore, we recommend that Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA be **dismissed**.  However, because Plaintiff has requested both declaratory and injunctive relief, our finding that RLUIPA does not allow monetary damages does not totally moot his claims.

### D.  Qualified Immunity

Defendant asserts the affirmative defense of qualified immunity.  Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker*, 229 F.3d 366, 370 (2d Cir. 2000).  Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir. 1999) (citation omitted).

---

[15] "The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted." *Bock v. Gold*, 2008 WL 345890, at *6.

Should the district court adopt this Court's recommendations, Plaintiff's RLUIPA and First Amendment religious expression claims against DOCS and Commissioner Fischer are all that will remain in this case. Qualified immunity does not apply to suits against individuals in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). We have already held that, with respect to Plaintiff's RLUIPA claim, monetary damages are not available against defendants in their individual or official capacities. As such, Plaintiff's RLUIPA claims will be limited to injunctive and declaratory relief against DOCS employees in their official capacities. Therefore, qualified immunity has no bearing on Plaintiff's RLUIPA claim. *See, e.g., Rodriguez v. City of New York*, 72 F.3d 1051, 1065 (2d Cir. 1995) ("[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities . . . and it protects only against claims for damages, not against claims for equitable relief."); *see also Rodriguez v. Phillips*, 66 F.3d 470, 481 (2d Cir. 1995) (noting that qualified immunity does not apply to claims for injunctive and declaratory relief against a defendant in his official capacity).

Plaintiff's claim for damages under the First Amendment, however, is subject to a qualified immunity analysis. On that issue, we find that it is not clearly established law that DOCS' hair policy, which allows only Rastafarians to wear dreadlocks, violates the Free Exercise Clause of the First Amendment. Although the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, *Benjamin v. Coughlin*, 905 F.2d at 576-77, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protection. *See*

*-30-*

*Redd v. Wright*, ___ F.3d ___ , 2010 WL 774304, at *4 (2d Cir. 2010) (citing cases for the proposition that constitutional rights should be defined with "reasonable specificity" for qualified immunity purposes and granting qualified immunity because a DOCS policy had not been held unconstitutional at the time it was enforced against the plaintiff). As such, under preexisting law a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was unlawful. *See Dean v. Blumenthal*, 577 F.3d 60, 68 (2d Cir. 2009) (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

Because we find that DOCS' policy did not violate clearly established law, qualified immunity would apply to all those who participated in its creation and enforcement. As such, should the District Court adopt our recommendation that Commissioner Fischer be substituted as a Defendant, Plaintiff's only potential relief against Fischer in his individual capacity could be non-monetary. *See Rodriguez v. Phillips*, 66 F.3d at 481. Likewise, the Eleventh Amendment's protection of the States' sovereign immunity would preclude any monetary damages Plaintiff would seek against Fischer in his official capacity. *See Farid v. Smith*, 850 F.2d at 921.

As such, should the District Court adopt our recommendations, DOCS and Commissioner Fischer will be substituted as Defendants and Plaintiff will be limited to non-monetary relief against those Defendants under both RLUIPA and § 1983.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED in part** and **DENIED in part** in accordance with the above Report-Recommendation; and it is further

*-31-*

**RECOMMENDED**, that DOCS and Commissioner Brian Fischer be substituted as Defendants pursuant to FED. R. CIV. P. 21; and it is further

**RECOMMENDED**, that Defendant Artus be **dismissed** from this action; and it is further

**RECOMMENDED**, that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants *sua sponte* by the Court, that the Clerk of the Court shall add the "New York State Department of Correctional Services" and "Commissioner Brian Fischer" as Defendants to the Docket of this action; and it is further

**RECOMMENDED**, that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants, that the Clerk shall issue Summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the substituted Defendants; and it is further

**RECOMMENDED**, that should DOCS and Fischer be substituted as Defendants, that those substituted Defendants shall file a response to Plaintiff's Complaint as provided for in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED**, that should DOCS and Fischer be substituted as Defendants, that upon the filing of their response to the Complaint, the Clerk shall notify Chambers so that a status conference may be scheduled; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL**

**PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   March 17, 2010
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge